No. 16-1404

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

VISTA-GRAPHICS, INC., et al.,

Plaintiffs-Appellants,

v.

VIRGINIA DEPARTMENT OF TRANSPORTATION, et al.,

Defendants-Appellees.

_____

On Appeal from the United States District Court
for the Eastern District of Virginia, Norfolk Division,
the Hon. Robert G. Doumar presiding (2:15-cv-00363-RGD-RJK)

_____

**BRIEF OF APPELLEES**
_____

MARK R. HERRING
*Attorney General of Virginia*

JEFFREY M. BOURNE
*Deputy Attorney General*

JEFFREY R. ALLEN (VSB #17710)
JANET W. BAUGH (VSB #44649)
ERIC K.G. FISKE (VSB #15814)
*Senior Assistant Attorneys General*

ELIZABETH B. MYERS (VSB #80739)
GRANT E. KRONENBERG (VSB #65647)
*Assistant Attorneys General*

July 5, 2016

TREVOR S. COX (VSB #78396)
*Deputy Solicitor General*
tcox@oag.state.va.us

STUART A. RAPHAEL (VSB #30380)
*Solicitor General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-7704 – Telephone
(804) 371-0200 – Facsimile

*Counsel for Appellees*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. ___16-1404___    Caption: ___Vista-Graphics, Inc. et al. v. VDOT, et al._____

Pursuant to FRAP 26.1 and Local Rule 26.1,

___Virginia Department of Transportation_____
(name of party/amicus)

_____

 who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐YES ☑NO
If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Jeffrey Rodgers Allen                    Date: ___April 22, 2016___

Counsel for: Va. Department of Transportation

## CERTIFICATE OF SERVICE
**************************

I certify that on ___April 22, 2016___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Jeffrey Rodgers Allen                                April 22, 2016
(signature)                                                     (date)

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __16-1404__    Caption: _Vista-Graphics, Inc. et al. v. VDOT. et al.,_____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Virginia Tourism Corporation_____
(name of party/amicus)

_____

 who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
       If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
       If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
       If yes, identify any trustee and the members of any creditors' committee:

Signature: __/s/ Jeffrey Rodgers Allen_____    Date: _____April 22, 2016_____

Counsel for: __Virginia Tourism Corporation_____

## CERTIFICATE OF SERVICE
**************************

I certify that on _____April 22, 2016_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

__/s/ Jeffrey Rodgers Allen_____        _____April 22, 2016_____
             (signature)                                    (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __16-1404__    Caption: __Vista-Graphics, Inc. et al. v. VDOT, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Aubrey L. Layne, Jr.__
(name of party/amicus)

_____

who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.     Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.     Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.     Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Jeffrey Rodgers Allen          Date: April 22, 2016

Counsel for: Aubrey L. Layne, Jr.

## CERTIFICATE OF SERVICE
**************************

I certify that on     April 22, 2016     the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Jeffrey Rodgers Allen                              April 22, 2016
        (signature)                                           (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __16-1404__    Caption: __Vista-Graphics, Inc. et al. v. VDOT, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Charles A. Kilpatrick, P.E.__
(name of party/amicus)

_____

who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.	Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?	☐YES ☑NO
If yes, identify entity and nature of interest:

5.	Is party a trade association? (amici curiae do not complete this question)	☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.	Does this case arise out of a bankruptcy proceeding?	☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Jeffrey Rodgers Allen	Date: April 22, 2016

Counsel for: Charles L. Kilpatrick, P.E.

## CERTIFICATE OF SERVICE
**************************

I certify that on _____April 22, 2016_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Jeffrey Rodgers Allen	April 22, 2016
(signature)	(date)

# TABLE OF CONTENTS

<u>Page</u>

CORPORATE DISCLOSURE STATEMENTS ........................................................i

TABLE OF CONTENTS ........................................................................... ii

TABLE OF AUTHORITIES .......................................................................v

ISSUES PRESENTED FOR REVIEW ...................................................1

STATEMENT OF THE CASE .............................................................2

    A.    Virginia's Rest Areas and the information distributed within them. ............................................................................2

    B.    Virginia creates programs to supervise the tourism information displayed within its Rest Areas. ...........................................4

    C.    Vista-Graphics files suit challenging the Commonwealth's control over materials distributed at the Rest Areas, and the district court dismisses the original complaint with leave to amend. ..............................................................................8

    D.    The district court dismisses the First Amended Complaint. ...............10

SUMMARY OF ARGUMENT ...........................................................13

STANDARD OF REVIEW ................................................................15

ARGUMENT ...................................................................................15

I.    Appellants lack standing to complain about the content restrictions. ...........15

    A.    Appellants have not alleged an "objectively reasonable" chilling effect caused by the content restrictions. ...............................17

    B.    Appellants' cases do not support their standing claim. .......................21

II.   Rest Area information displays are government speech that is not
      subject to First Amendment scrutiny. ...........................................24

      A.   The case was properly dismissed because Appellants' allegation
           that their publications are "private speech on public property" is
           a legal conclusion, not a fact that must be accepted as true. ..............24

      B.   The Rest Area information displays are government speech..............25

           1.   The Rest Area information displays convey a government
                message. ......................................................................26

           2.   The Rest Area information displays are closely identified
                with the government. ................................................27

           3.   Virginia exercises editorial control over the content of
                the Rest Area information displays...........................................29

      C.   Appellants' attempts to distinguish *Summum* and *Walker* are
           unavailing. ................................................................31

           1.   It is irrelevant that the Rest Area information displays
                include materials not produced by the government.................31

           2.   It is irrelevant that the materials in Rest Area information
                displays are not permanent fixtures. .........................................33

           3.   Imposing fees to include materials in Rest Area
                information displays does not convert government speech
                into private speech. ................................................35

      D.   Because the Rest Area information displays are government
           speech, the government's content restrictions are not subject to
           First Amendment scrutiny.................................................36

III.  Even if forum analysis were necessary, Rest Areas are nonpublic
      forums in which speech is subject to reasonable restrictions.......................41

      A.   The Rest Areas are nonpublic forums.................................41

B.  Because Rest Areas are nonpublic forums, Virginia is entitled to impose reasonable restrictions and fees on the information displays. ...............................................................45

1.  The content restrictions that Appellants challenge are viewpoint-neutral and therefore permissible. ...........................45

2.  The imposition of fees does not violate the First Amendment. ...............................................................48

C.  The Virginia Administrative Code does not confer any additional speech rights on Appellants. ...............................51

CONCLUSION ...............................................................52

STATEMENT REGARDING ORAL ARGUMENT ...........................54

CERTIFICATE OF COMPLIANCE...........................54

CERTIFICATE OF SERVICE ...............................................................54

# TABLE OF AUTHORITIES

Page

**CASES**

*ACLU v. Mineta,*
    319 F. Supp. 2d 69 (D.D.C. 2004) ................................................................42

*Aetna Life Ins. Co. v. Haworth,*
    300 U.S. 227 (1937) ....................................................................................16

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ....................................................................................24

*Atlanta Journal & Constitution v. City of Atlanta Dep't of Aviation,*
    322 F.3d 1298 (11th Cir. 2003) ..................................................................48

*Babbitt v. United Farm Workers Nat'l Union,*
    442 U.S. 289 (1979) ....................................................................................17

*Beck v. Shelton,*
    267 Va. 482, 593 S.E.2d 195 (2004) ..........................................................44

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ....................................................................................24

*Benham v. City of Charlotte,*
    635 F.3d 129 (4th Cir. 2011) ............................................................ passim

*Bordell v. Gen. Elec. Co.,*
    922 F.2d 1057 (2d Cir. 1991) ............................................................ 21, 23

*Burke v. City of Charleston,*
    139 F.3d 401 (4th Cir. 1998) ......................................................................17

*Child Evangelism Fellowship v. Anderson Sch. Dist.,*
    470 F.3d 1062 (4th Cir. 2006) ....................................................................50

*Cincinnati v. Discovery Network, Inc.,*
    507 U.S. 410 (1993) ....................................................................................49

*City of Lakewood v. Plain Dealer Publ'g Co.*,
 486 U.S. 750 (1988) ................................................................50

*Clatterbuck v. City of Charlottesville*,
 708 F.3d 549 (4th Cir. 2013 ............................................... 22, 42

*Cooksey v. Futrell*,
 721 F.3d 226 (4th Cir. 2013) ............................................ passim

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
 473 U.S. 788 (1985) .......................................................... 43, 45

*Covenant Media of S.C., LLC v. City of North Charleston*,
 493 F.3d 421 (4th Cir. 2007) .................................................17

*Cox v. City of Charleston*,
 416 F.3d 281 (4th Cir. 2005) .................................................50

*Elam v. Bolling*,
 53 F. Supp. 2d 854 (W.D. Va. 1999) ......................................50

*Flast v. Cohen*,
 392 U.S. 83 (1968) ...............................................................16

*Forsyth County v. Nationalist Movement*,
 505 U.S. 123 (1992) .......................................................... 49, 50

*FW/PBS, Inc. v. City of Dallas*,
 493 U.S. 215 (1990) ..............................................................17

*Gannett Satellite Info. Network, Inc. v. Metro. Transp. Auth.*,
 745 F.2d 767 (2d Cir. 1984) ..................................................48

*Greer v. Spock*,
 424 U.S. 828 (1976) ..............................................................43

*Hague v. CIO*,
 307 U.S. 496 (1939 ...............................................................43

*Ill. Dunesland Pres. Soc. v. Ill. Dep't of Nat. Res.*,
 584 F.3d 719 (7th Cir. 2009) .................................... 32, 37, 39, 40

*Jacobsen v. Bonine*,
    123 F.3d 1272 (9th Cir. 1997) ................................................. 42, 45

*Jacobsen v. Howard*,
    109 F.3d 1268 (8th Cir. 1997) ...................................................42

*Jacobsen v. Illinois DOT*,
    419 F.3d 642 (7th Cir. 2005)................................................. 42, 43

*James v. Washington Metro. Area Transit Auth.*,
    649 F. Supp. 2d 424 (D. Md. 2009) ...........................................42

*Kemler v. Poston*,
    108 F. Supp. 2d 529 (E.D. Va. 2000) .........................................24

*Laird v. Tatum*,
    408 U.S. 1 (1972) ................................................................ 17, 18

*Lehman v. City of Shaker Heights*,
    418 U.S. 298 (1974).................................................................46

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) .................................................................16

*Morrison v. Bd. of Educ. of Boyd Cty.*,
    521 F.3d 602 (6th Cir. 2008).....................................................20

*Norfolk 302, LLC v. Vassar*,
    524 F. Supp. 2d 728 (E.D. Va. 2007) .........................................23

*N. C. Right to Life, Inc. v. Bartlett*,
    168 F.3d 705 (4th Cir. 1999).....................................................22

*Page v. Lexington Cty. Sch. Dist. One*,
    531 F.3d 275 (4th Cir. 2008).....................................................30

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
    460 U.S. 37 (1983)............................................................. 41, 45

*Pleasant Grove City v. Summum*,
    555 U.S. 460 (2009) ..........................................................passim

*Raines v. Byrd*,
521 U.S. 811 (1997)........................................................................15

*Reed v. Town of Gilbert*,
135 S. Ct. 2218 (2015)...................................................................49

*Reynolds v. Middleton*,
779 F.3d 222 (4th Cir. 2015)..........................................................42

*Robert v. City of Norfolk*,
188 Va. 413 (1948) ................................................................. 42, 50

*Rock for Life-UBMC v. Hrabowski*,
411 F. App'x 541 (4th Cir. 2010) ............................................ 18, 21

*Sanders v. City of Seattle*,
156 P.3d 874 (Wash. 2007)............................................................42

*Sentinel Commc'ns Co. v. Watts*,
936 F.2d 1189, 1203-04 (11th Cir. 1991) ............................... 42, 43

*Shenandoah Valley Network v. Capka*,
669 F.3d 194 (4th Cir. 2012).................................................. 16, 20

*Shuttlesworth v. City of Birmingham*,
394 U.S. 147 (1969)................................................................ 42, 50

*Sons of Confederate Veterans, Va. Div. v. City of Lexington*,
722 F.3d 224 (4th Cir. 2013)................................................... 15, 41

*Spokeo, Inc. v. Robins*,
136 S. Ct. 1540 (2016) ............................................................ 15, 16

*Summum v. Pleasant Grove City*,
499 F.3d 1170 (10th Cir. 2007) .....................................................38

*U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*,
453 U.S. 114 (1981 ........................................................................41

*United States v. Kokinda*,
497 U.S. 720 (1990) .......................................................................46

*Walker v. Texas Div., Sons of Confederate Veterans,*
　　135 S. Ct. 2239 (2015) ................................................................ passim

*Warth v. Seldin,*
　　422 U.S. 490 (1975) .................................................................... 15, 17

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend I ...................................................................... passim

U.S. Const. art. III ....................................................................... 15, 16

**STATUTES**

Va. Code Ann. § 2.2-2315(C) (2014) ........................................................6

Va. Code Ann. § 33.2-1200 (2014)............................................... passim

Va. Code Ann. § 33.2-1217 (2014)...........................................................2

Va. Code Ann. § 33.2-1217(D) (2014) ................................. 4, 28, 29, 47

**REGULATIONS**

23 C.F.R. § 752.3(a)...............................................................................2, 43

23 C.F.R. § 752.5 ......................................................................................2

23 C.F.R. § 752.7(a)..................................................................................4

24 Va. Admin. Code § 30-50-10(L)............................................ 3, 9, 30

24 Va. Admin. Code § 30-151-10...........................................................51

24 Va. Admin. Code § 30-151-670.........................................................51

24 Va. Admin. Code § 30-151-670(2)(b) ................................................51

**OPINIONS OF THE ATTORNEY GENERAL OF VIRGINIA**

2013 Op. Va. Att'y Gen. 55 ........................................................... 44, 48

## ISSUES PRESENTED FOR REVIEW

The Virginia Department of Transportation ("VDOT") operates 41 rest areas and welcome centers located along the interstate highways in Virginia. Working under the authority of VDOT, the Virginia Tourism Authority (doing business as the Virginia Tourism Corporation ("VTC")) manages, through a contractor, a program that allows vendors to place tourism-related materials in Rest Area information displays for a fee.

Plaintiffs-Appellants Vista-Graphics, Inc. and its owner Randal W. Thompson—publishers of three tourism guides distributed at the Rest Areas—claim that two aspects of Virginia's information program are unconstitutional: that the government limits the content of materials permitted in the displays to travel- and tourism-related information, and that fees are imposed for including materials in the displays. The district court twice rejected those claims, dismissing the initial complaint and then, after granting leave to amend, the First Amended Complaint.

The issues on appeal are:

(1)    Whether the district court was correct to conclude that Plaintiffs-Appellants lacked standing to challenge the content restrictions because they had not adequately alleged any injury from the restrictions; and

(2)    Whether the district court was correct to conclude that Rest Area information displays are government speech and that the fees were not subject to First Amendment challenge.

1

## STATEMENT OF THE CASE

**A.   Virginia's Rest Areas and the information distributed within them.**

VDOT operates 41 rest areas and welcome centers (collectively, "Rest Areas") throughout the Commonwealth.[1]  Forty of these facilities are located along the federal interstate highways that run through Virginia—Interstates 95, 64, 66, 81, 85, and 77—and one is located along U.S. Route 13 near the Virginia-Maryland border.[2]  The Rest Areas are regulated by the Code of Federal Regulations and the Code of Virginia and are maintained by VDOT.[3]

Virginia has "established and maintained" these Rest Areas "for the convenience of the traveling public."[4]  The Rest Areas exist to inform and keep travelers safe in a variety of important ways:

> by providing clean, safe[,] attractive, neutral, convenient, accommodating facilities for travelers of all ages who seek nourishment, hydration, convenience products, rest, rest room facilities, exercise and travel-related information.[5]

---

[1] *See Safety Rest Areas and Welcome Centers*, First Am. Compl. Ex. B at 1-2 (JA 191-92).

[2] *Id.*

[3] *See* 23 C.F.R. § 752.5; Va. Code Ann. §§ 33.2-1200 (2014), 33.2-1217 (2014).

[4] Va. Code Ann. § 33.2-1200.

[5] *VDOT Implementation of Rest Area Revenue Generating Programs*, First Am. Compl. Ex. E at 1 (JA 197).  *See also* 23 C.F.R. § 752.3(a) (defining "safety rest area" as a "roadside facility safely removed from the traveled way with parking

2

In addition, eleven of the Rest Areas function as "welcome centers,"[6] with personnel on-site to provide information to travelers. A regulation promulgated by VDOT generally governs conduct at Rest Areas and waysides; among other things, it provides that "[n]o threatening, abusive, boisterous, insulting or indecent language . . . shall be used" in those areas.[7] The Rest Areas serve more than 30 million visitors to Virginia each year.[8]

Fulfilling its mission of providing "travel-related information" at Rest Areas, VDOT has created information displays at each Rest Area to provide maps and other tourism materials to those using the highways.[9] Its authority to do so is expressly given in the Code of Virginia:

> In order to provide information in the specific interest of the traveling public, the Department is authorized to maintain maps, permit informational directories and advertising pamphlets to be made available at rest areas, and

---

and such facilities for the motorist deemed necessary for his rest, relaxation, comfort and information needs").

[6] *See Safety Rest Areas and Welcome Centers*, First Am. Compl. Ex. B at 1-2 (JA 191-92).

[7] 24 Va. Admin. Code § 30-50-10(L). The regulation was promulgated under authority given in Code §§ 33.2-210 and 33.2-246.

[8] *VDOT Implementation of Rest Area Revenue Generating Programs*, First Am. Compl. Ex. E at 1 (JA 197).

[9] *See* First Am. Compl. ¶ 11 (JA 172) (Rest Areas have "[h]istorically . . . existed" for a "variety of purposes" including "dissemination of information" and "promotion of tourism").

> establish information centers at rest areas for the purpose of
> informing the public of places of interest within the
> Commonwealth and providing such other information as may
> be considered desirable.[10]

That authority also comes from federal regulations, which specifically allow States

to use interstate rest areas to "provid[e] specific information to the motorist as to

services, as to places of interest within the State and such other information as the

State may consider desirable."[11]

### B. Virginia creates programs to supervise the tourism information displayed within its Rest Areas.

In 2012, Virginia began to implement the Sponsorship, Advertising, and

Vending Enhancement ("SAVE") program, the goal of which is to "offset

maintenance and operations costs . . . by permitting marketing of sponsorships,

vended products and advertising to travelers who use Rest Areas."[12]  Vendors who

place sponsorships, products and advertising at Rest Areas are charged a

"commercially reasonable fee for display or distribution."[13]

---

[10] Va. Code Ann. § 33.2-1217(D) (2014).  *See also* Va. Code Ann. § 33.2-1200 (defining an "information center" as "an area or site established and maintained at rest areas for the purpose of informing the public of places of interest within the Commonwealth and providing such other information as the Commonwealth may consider desirable").

[11] 23 C.F.R. § 752.7(a).

[12] *VDOT Implementation of Rest Area Revenue Generating Programs*, First Am. Compl. Ex. E at 1 (JA 197).

[13] *Id.*

4

Under the SAVE program, VDOT is authorized to contract with another entity to "serve the safety and related needs of the traveling public through appropriate . . . programs."[14]  But VDOT remains "ultimately responsible for the appropriate and lawful administration of the SAVE program, and to that end, adopt[ed] . . . internal standards governing the administration of" the program.[15]  Among the standards required by VDOT for participants in the SAVE program are the following:

- VDOT must approve all materials prior to their display, and they "must comport with the purposes of the [Rest Area]";[16]

- Rest Areas "and all spaces within will be maintained as non-public forums in which reasonable, uniform, viewpoint-neutral standards will be applied to determine whether [proposed materials] are appropriate";[17]

- the "[s]ubject matter will be limited to commercial speech, VDOT or government information (e.g. maps, 511 traffic monitoring program) relating to highways, the safety and welfare of the traveling public, and other activities of the Commonwealth";[18] and

- materials may not include content that "states or implies that the Commonwealth or any of its agencies endorse a commercial vendor product or service," "demeans or disparages an individual or group of individuals," "promotes a political candidate or issue," "is obscene as

---

[14] *Id.* at 2 (JA 198).

[15] *Id.*

[16] *Id.* at 3 (JA 199).

[17] *Id.*

[18] *Id.*

defined in Code of Virginia § 18.2-372," "incites or promotes illegal activity," or "is deceptive."[19]

VDOT later gave authority to the Virginia Tourism Authority, doing business as the VTC,[20] to oversee the advertising portion of the SAVE program.

In June 2015, VTC executed a contract with Highway Information Media, LLC ("HIM") to "plan, implement, deliver and manage a comprehensive and quality Partnership Marketing and Advertising Program" ("PMAP").[21] The VTC-HIM Contract included restrictions that effectuate the advertising standards VDOT had developed. HIM is prohibited by the Contract from entering into any agreement that would result in advertising for, among other things: "liquor or tobacco products" (although "tours of wineries, cideries, meaderies, distilleries, and breweries are acceptable"); "religious purposes"; "solicitation of memberships, subscriptions, registrations, or donations"; and "the promotion of political candidates or political purposes."[22]

---

[19] *Id.* at 3-4 (JA 199-200).

[20] *See* Va. Code Ann. § 2.2-2315(C) (2014) (creating the Virginia Tourism Authority as a "public body corporate and political subdivision of the Commonwealth"; providing that the Authority's exercise of power "shall be deemed and held to be the performance of an essential governmental function of the Commonwealth"; authorizing the Authority "to do business as the 'Virginia Tourism Corporation'").

[21] *Virginia Tourism Corporation Standard Contract* (June 1, 2015) ("VTC-HIM Contract"), First Am. Compl. Ex. G at 2 (JA 204).

[22] *Id.* at 4-5 (JA 206-07).

HIM and VTC also developed a "PMAP Policies" document as part of the program delivery.[23]  As described by that document, PMAP "provides tourism-related organizations the opportunity to market, advertis[e] and promote themselves at Virginia Welcome Centers . . . and Safety Rest Areas."[24]  Under PMAP, "[t]ravel attractions are promoted . . . through [a variety of] advertising options . . . as authorized by the [VTC] in partnership with [HIM] and with permission from [VDOT]."[25]

Consistent with VDOT's internal standards and with the advertising restrictions stipulated in the VTC-HIM Contract, the PMAP Policies document lists the following, among other materials, as "disqualified content":

- "[a]dvertising of liquor or tobacco products.  (Advertising for tours of wineries, breweries, distilleries and meaderies is acceptable)";

- "[p]olitical or religious advertisement";

- "[a]dvertisement which solicits memberships, subscriptions, registrations, or donations"; and

- "[p]ublications . . . that are not targeted to the traveling public or tourism related."[26]

---

[23] *See Virginia Welcome Centers & Safety Rest Areas Partnership Marketing & Advertising Program Policies* (June 1, 2015) ("PMAP Policies"), First Am. Compl. Ex. H (JA 231).

[24] *Id.* at 1 (JA 231).

[25] *Id.* (JA 231).

[26] *Id.* at 9 (JA 239).

The PMAP Policies document explains that PMAP "is a paid participation program" and that "rates for advertising . . . are set by [HIM] with approval from the [VTC].  Signed contracts are required annually for advertising placed at" Rest Areas.[27]

### C.    Vista-Graphics files suit challenging the Commonwealth's control over materials distributed at the Rest Areas, and the district court dismisses the original complaint with leave to amend.

Vista-Graphics, Inc., which is owned by its president, Randal W. Thompson (collectively, "Vista-Graphics"), is a participant in PMAP.  Vista-Graphics publishes three guides for visitors to Virginia: *Virginia Guide*, *Virginia Beach Visitors Guide*, and *GoWilliamsburg Visitors Guide*.[28]  These guides contain information about lodging, attractions, restaurants, and other Virginia tourism activities, as well as advertising from local Virginia businesses.[29]

Vista-Graphics alleged that it has placed its guides in various Rest Area information displays for more than eight years and has continued to place its guides despite the imposition of fees beginning in 2012.[30]  Vista-Graphics alleged that it initially refused to pay the fees to HIM, but when told by HIM that it could not

---

[27] *Id.* at 1 (JA 231).

[28] First Am. Compl. ¶ 1 (JA 167).

[29] *Id.* (JA 167-68).

[30] *Id.* ¶¶ 8, 10, 22 (JA 170-72, 184).

place their publications in the Rest Areas otherwise, Vista-Graphics "relented and began paying the fees."[31]

On July 8, 2015, Vista-Graphics filed suit in the Circuit Court of Accomack County, Virginia, against the Secretary of Transportation, VDOT and its Commissioner, VTC, and HIM,[32] claiming that the content restrictions and fees imposed by SAVE and PMAP unconstitutionally burden its free-speech rights.[33] Vista-Graphics also asserted that the restrictions in 24 Virginia Administrative Code § 30-50-10(L)—the regulation covering Rest Areas and waysides—that generally prohibit threatening, abusive, and insulting language are "unconstitutionally restrictive and vague and, therefore, are void."[34]

On August 13, 2015, the defendants removed the case to the United States District Court for the Eastern District of Virginia,[35] and a week later filed a motion to dismiss.  Following briefing and oral argument, the district court concluded that Vista-Graphics "fail[ed] to allege specific facts that they have suffered an injury-

---

[31] *Id.* ¶ 10 (JA 172).

[32] Vista-Graphics named HIM as a defendant "solely as a party in interest that may choose to respond . . . [but] is not required to respond to this lawsuit . . . ."  Compl. ¶ 6 (JA 16); First Am. Compl. ¶ 6 (JA 169-70).  HIM did not participate in the case below, *see* Opinion and Order at 2 (JA 245), and is not an Appellee.

[33] Compl. (JA 13).

[34] JA 30.

[35] JA 8.

in-fact" because of the PMAP content restrictions.[36]  The court dismissed the suit

without prejudice, granting Vista-Graphics twenty-one days' leave to amend to

provide further facts.[37]

### D.    The district court dismisses the First Amended Complaint.

On November 11, 2015, Vista-Graphics filed a First Amended Complaint.

Like the initial complaint, the First Amended Complaint attached copies of the

VDOT Implementation document, the VTC-HIM Contract, and the PMAP Policies

document, but in response to the district court's skepticism regarding Vista-Graphics'

standing, it included more description about SAVE and PMAP and added

allegations on how the regulations allegedly affected them.[38]  For instance, Vista-

Graphics alleged that its visitor guides have historically "included material that

would violate the currently applicable content restrictions" because "some of the

information would be considered political or religious."[39]  Vista-Graphics said that

its brochures "may currently be in violation of the ban on religious advertisements

because they generally list 'places of worship' and provide information that

---

[36] JA 165.

[37] JA 165-66.

[38] *See, e.g.*, First Am. Compl. ¶¶ 22-24 (JA (184-85).

[39] *Id.* ¶ 22 (JA 184).

constitutes advertisement of religious entities, groups and facilities."[40]  Vista-

Graphics did not allege, however, that it has ever been told to cease and desist from

including any advertisements.

Vista-Graphics also alleged that it has "engaged in self-censorship and ha[s]

refrained from soliciting and distributing many forms of information and

advertising that would help the plaintiffs generate profit."[41]  It generally alleged it

would like to sell advertisements in its guides that:

> (1) solicit donations, (2) advertise commercial and residential
> real estate, (3) provide ratings and opinions relating to various
> businesses and services, (4) advertise properties with
> membership requirements, (5) advertise liquor and tobacco
> products, and (6) constitute political and religious
> advertisements and messages.[42]

Finally, Vista-Graphics pleaded that it would like to pursue advertisement

opportunities that VTC may find "offensive," but it does not know the scope of

what that may include.[43]  It cited the reputational harm it would suffer if it solicited

advertisements but then could not publish them because they violated the

restrictions.[44]

---

[40] *Id.*

[41] *Id.* ¶ 23 (JA 184).

[42] *Id.* (JA 185).

[43] *Id.*

[44] *Id.*

11

The defendants again filed a motion to dismiss, which the district court granted on March 18, 2016 in a 30-page opinion and order.[45]  As to the challenged restrictions on content, the district court again concluded that plaintiffs "failed to sufficiently plead that they have suffered an injury-in-fact on account of the restrictions," and consequently "they lack standing to challenge the restrictions."[46]  As to the fees, the district court found that Vista-Graphics had standing to challenge them because they had paid them.[47]  But the court found that "the merits of this claim are irrelevant because the Welcome Center displays are government speech and not subject to First Amendment analysis."[48]  Accordingly, the district court held that the plaintiffs had not stated a claim for relief.[49]  The court denied the plaintiffs leave to amend a second time and dismissed the case with prejudice.[50]

---

[45] The parties briefed the defendants' motion to dismiss, but the district court opted not to hear oral argument because "the issues raised in the [motion] were thoroughly argued" at the hearing on the defendants' previous motion to dismiss. Opinion and Order at 3 (JA 246).

[46] *Id.* at 17-18 (JA 260-61).  *See also id.* at 10 (JA 252-53) (holding that the plaintiffs "failed to plead an objectively reasonable 'chilling' or self-censorship of their speech rights that would support their claim of standing to challenge the restrictions").

[47] Opinion and Order at 18 (JA 261).

[48] *Id.* at 18 (JA 261).

[49] *Id.* at 28 (JA 271).

[50] *Id.* at 30 (JA 273).

12

The plaintiffs timely noted their appeal.[51]

## SUMMARY OF ARGUMENT

The district court's decision should be affirmed for three reasons. First, Appellants lack standing to complain about the regulations restricting what may be included in the Rest Area information displays. They did not allege facts sufficient to show that they have suffered an injury stemming from the restrictions, such as an "objectively reasonable" chilling effect. Appellants do not allege that anyone has threatened any adverse action against them, and they concede that they have continued to publish ads that they believe may violate the restrictions.

Second, under controlling Supreme Court case law, the tourism materials placed in Rest Area information displays is government speech, just like the monuments and license plates in *Pleasant Grove City v. Summum*[52] and *Walker v. Texas Division, Sons of Confederate Veterans*,[53] respectively. Application of the three-factor test adopted by the Supreme Court shows that the information displays are government speech:

- they convey the government message of promoting tourism and safe travel;

---

[51] JA 275.

[52] 555 U.S. 460 (2009) (privately designed and donated monuments in city park are government speech).

[53] 135 S. Ct. 2239 (2015) (specialty license plates proposed by private organizations are government speech).

13

- they are closely identified with the government, not least because they are in a government facility; and

- the government exercises editorial control over the content of the displays.

Appellants' attempts to distinguish those controlling precedents fall flat. It is irrelevant that Appellants produced the tourism publications included in the information displays; the Sons of Confederate Veterans developed the license-plate design in *Walker*. It is also irrelevant that the tourism publications are not "permanent" like the monuments in *Summum*; the license plates in *Walker* were similarly not "permanent." And it is irrelevant that fees are charged for placement of the materials; fees were also charged in *Walker*. Because the information displays are government speech, they are immune from First Amendment challenge, and no forum analysis is necessary.

Third, even if forum analysis were conducted, the case was still properly dismissed because the Rest Areas are nonpublic forums, where the government is permitted to impose fees as well as reasonable restrictions on content. The restrictions Virginia has imposed—such as requiring that materials be tourism-related and advertise attractions in Virginia—do not offend the First Amendment.

14

## STANDARD OF REVIEW

This Court "review[s] de novo a district court's dismissal for lack of standing and ripeness."[54]  As the parties invoking jurisdiction, Appellants "bear[] the burden of establishing the[] elements" of standing.[55]  "Where, as here, a case is at the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element."[56]  The Court also reviews de novo the dismissal of a complaint for failure to state a claim.[57]

## ARGUMENT

### I.    Appellants lack standing to complain about the content restrictions.

"Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy" under Article III, and it developed "to ensure that federal courts do not exceed their authority."[58]  Courts must only address actual disputes that are "definite and concrete, touching the legal relations of parties having

---

[54] *Cooksey v. Futrell*, 721 F.3d 226, 234 (4th Cir. 2013).

[55] *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

[56] *Id.* (citing *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

[57] *Sons of Confederate Veterans, Va. Div. v. City of Lexington*, 722 F.3d 224, 231 (4th Cir. 2013) (affirming dismissal of First Amendment challenge to ordinance banning private access to city's flagpoles).

[58] *Spokeo*, 136 S. Ct. at 1547.  *See also Raines v. Byrd*, 521 U.S. 811, 818 (1997) ("[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.") (internal punctuation altered).

adverse interests,"[59] lest they issue an advisory opinion.[60]  As the U.S. Supreme

Court recently summarized: "a plaintiff must show that he or she suffered 'an

invasion of a legally protected interest' that is 'concrete and particularized' and

'actual or imminent, not conjectural or hypothetical.'"[61]

Under the standing test developed by the Supreme Court and applied by this

Court in *Cooksey v. Futrell*, a claimant must demonstrate (1) an injury-in-fact; (2) a

causal connection between the injury and the conduct complained of; and (3) that the

injury can be redressed by a favorable decision.[62]  Notwithstanding that the standing

requirements are "relaxed somewhat in First Amendment cases,"[63] "the claimant

must nevertheless satisfy the injury-in-fact requirement grounded in Article III."[64]

---

[59] *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937).

[60] *Flast v. Cohen*, 392 U.S. 83, 96 (1968) ("[T]he oldest and most consistent thread in the federal law of justiciability is that the federal courts will not give advisory opinions.") (internal punctuation and citation omitted); *Shenandoah Valley Network v. Capka*, 669 F.3d 194, 202 (4th Cir. 2012) ("[A] dispute is lacking here—and because we cannot issue an advisory opinion—we have no authority to adjudicate this suit.").

[61] *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

[62] 721 F.3d at 234-35 (quoting *Lujan*, 504 U.S. at 560).

[63] JA 254 (citing *Cooksey*, 721 F.3d at 235).

[64] *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011).  To the extent Appellants challenge the restrictions as overbroad, First Am. Compl. ¶¶ 14-15, 17 (JA 174-75, 179), they are nonetheless "obligated as an initial matter to allege a

16

And "a plaintiff must establish that he has standing to challenge each provision of an ordinance by showing that he was injured by application of those provisions."[65]

The district court was correct to find that Appellants lacked standing because their general claims of self-censorship as a result of the content restrictions were too speculative to satisfy the injury requirement.

### A. Appellants have not alleged an "objectively reasonable" chilling effect caused by the content restrictions.

Appellants chiefly argue that the advertising regulations have caused a "chilling" effect on their activities, and that they have engaged in self-censorship, because it is unclear what conduct is prohibited by the restrictions. But for a chilling effect to constitute an injury-in-fact, a party must demonstrate that the injury or threat of injury is "'credible' and not 'imaginary or speculative.'"[66] That requires more than a bare claim that a party was "chilled from exercising h[is] right to free expression."[67] The Supreme Court made that clear in *Laird v. Tatum*: "Allegations of a subjective 'chill' are not an adequate substitute for a claim of

distinct and palpable injury as required by Article III." *Burke v. City of Charleston*, 139 F.3d 401, 405 n.2 (4th Cir. 1998) (citing *Warth*, 422 U.S. at 501).

[65] *Covenant Media of S.C., LLC v. City of North Charleston*, 493 F.3d 421, 429-30 (4th Cir. 2007) (citing *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 230 (1990)).

[66] *Cooksey*, 721 F.3d at 235 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

[67] *Id.* at 235 (quoting *Benham*, 635 F.3d at 135).

specific present objective harm or a threat of specific future harm."[68]  Thus, this Court has held, "[s]ubjective or speculative accounts of such a chilling effect . . . are not sufficient."[69]  Rather, the chilling effect must be "objectively reasonable."[70]  Appellants have failed to meet that bar—and despite that the district court correctly found that to be a critical deficiency in their claim, they did not address it in their brief.

The district court was correct to conclude that Appellants' claims of self-censorship are not reasonable in the absence of any past enforcement action.[71]  Appellants failed to point to any indication that they have been coerced to alter their conduct.[72]  For instance, they do not allege:

- that their publications or any ad in them have been formally rejected by Appellees,[73] let alone that they have appealed and lost an adverse agency decision;

---

[68] 408 U.S. 1, 13-14 (1972).

[69] 721 F.3d at 236 (quoting *Benham*, 635 F.3d at 135).

[70] *Id.* at 236 (quoting *Benham*, 635 F.3d at 135).

[71] JA 260.

[72] *See Rock for Life-UBMC v. Hrabowski*, 411 F. App'x 541, 548 (4th Cir. 2010) (no standing by organization challenging university's sexual-harassment policy where the organization did "not allege facts suggesting that UMBC officials ever threatened to punish their speech as sexual harassment").

[73] *See* Opinion and Order at 18 (JA 261) (noting that Vista-Graphics has "never had a publication rejected by the State").

18

- that they have ever been told informally that their publications or any ad in them violates the restrictions in the regulations,[74] despite Appellants' own conclusion that they have committed violations;[75]

- that anyone has complained that their publications are offensive, deceptive or otherwise in violation of those restrictions; or

- that they have ever been threatened with any legal proceeding for violating any restrictions.

Appellants have not experienced any demonstrable injury as a result of the restrictions.[76]

Appellants also assert they have engaged in self-censorship with respect to ads that they might "like to solicit" but have not solicited, because they do not know what evaluation criteria VDOT or VTC might use to judge those ads.[77]  But Appellants have not sought any guidance from the State about whether a particular proposed advertisement would run afoul of the content restrictions.  They do not allege that they have ever asked VDOT or VTC to evaluate any particular ad, or that they have

---

[74] *See* First Am. Compl. Exs. E-H (JA 197-240).

[75] First Am. Compl. ¶ 22 (JA 184).

[76] The absence of injury also means that Appellants' claims are not ripe for judicial review.  *See Cooksey*, 721 F.3d at 240 (noting that the "ripeness inquiry . . . is inextricably linked to [the] standing inquiry").

[77] First Am. Compl. ¶ 23 (JA 184-85).

19

ever been advised that any particular ad may be prohibited. In the absence of such allegations, Appellants' claim of a chilling effect is not "objectively reasonable."[78]

Not only do Appellants' claims of "self-censorship" rest on unsupported speculation, so do their purported injuries. They allege that they "do not feel able to risk various known and unknown consequences of being found in violation of the rules," but cite only one possible injury in particular: "the damage to reputation and good will that will be caused if [they] solicit certain kinds of business from people and entities and then fail to deliver the promised products and services."[79] That alleged injury is too "imaginary or speculative" to support standing.[80]

Appellants' allegations also appear less "credible" when read alongside their acknowledgement that they are already placing advertisements in their publications that they believe violate the restrictions of which they complain:

> Historically, the information supplied by [Vista-Graphics] has included material that would violate the currently applicable content restrictions. For example, some of the information would

---

[78] *See Morrison v. Bd. of Educ. of Boyd Cty.*, 521 F.3d 602, 610 (6th Cir. 2008) (finding no justiciable injury where plaintiff's "own subjective apprehension counseled him to choose caution and where he assumed—solely on the basis of the Board's 2004-05 policies and without any specific action by the Board—that were he to speak, punishment would result").

[79] First Am. Compl. ¶ 24 (JA 185).

[80] *Cooksey*, 721 F.3d at 235. *See Shenandoah Valley Network*, 669 F.3d at 202 ("[T]he prospect of appellants' alleged injury . . . is sufficiently remote that we have no authority to consider appellants' request. There is simply nothing for this court to adjudicate.").

20

> be considered political or religious.  In fact, plaintiffs may
> currently be in violation of the ban on religious advertisements
> because they generally list 'places of worship' and provide
> information that constitutes advertisement of religious entities,
> groups and facilities.[81]

Essentially, Appellants seek to establish standing by claiming that they have engaged

in self-censorship, but simultaneously admit that they have *not* engaged in self-

censorship.  The district court correctly considered those contradictory allegations

as part of its analysis of the "reasonableness of the alleged self-chilling."[82]  Far

from helping to establish standing, that admission demonstrates that they have

suffered no injury-in-fact.[83]

## B.    Appellants' cases do not support their standing claim.

The cases cited by Appellants also do not advance their argument that they

have standing to challenge the restrictions.

To begin with, their reliance on *Cooksey v. Futrell* is misplaced, given the

very different facts involved there.  The plaintiff in that case was contacted by the

---

[81] First Am. Compl. ¶ 22 (JA 184).

[82] JA 259.

[83] *See Rock for Life-UBMC v. Hrabowski*, 411 F. App'x 541, 548 (4th Cir. 2010)
(no chilling effect shown by organization challenging university's sexual-
harassment policy where the organization showed "its display on campus twice and
has not faced threatened or actual disciplinary action for sexual harassment");
*Bordell v. Gen. Elec. Co.*, 922 F.2d 1057, 1060-61 (2d Cir. 1991) (rejecting claim
of injury where plaintiff's assertion of self-chilling was belied by his having made
numerous statements on the allegedly prohibited topic).

executive director of a State regulatory board, told that his website was

under investigation," and instructed to remove part of it.[84]  The plaintiff was given

a mark-up of his website annotated with specific "areas of concern" that he was

instructed to remove.[85]  By contrast, there is no allegation here that Appellees have

taken any action to enforce the content restrictions against any of Appellants'

publications.  The opposite is true: Appellants concede that even though their

publications currently include ads that may violate the restrictions, they have not

suffered any consequence.  The restrictions challenged here have not affected

Appellants or their business; have not constituted an imminent threat; and have not

had a chilling effect on their business.

Also unlike this case, *Cooksey* involved a "threat of sanctions"[86] and a

"credible threat of prosecution."[87]  Here, Appellants have not alleged any similar

threat of legal action against them for violating the restrictions.  The absence of

such a serious threat also distinguishes Appellants' cases *Clatterbuck v. City of

Charlottesville*, where a city ordinance criminalized soliciting money on a

---

[84] 721 F.3d at 231.

[85] *Id.*

[86] *Id.* at 235.

[87] *Id.* at 237.  *See also id.* at 231 (Cooksey "'feared civil and criminal action
against him . . . .'").  *Cf. N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 710 (4th
Cir. 1999) (permitting "pre-enforcement challenge" to a criminal statute proceed
where plaintiff "face[d] a credible threat of prosecution").

22

downtown pedestrian mall,[88] and *Norfolk 302, LLC v. Vassar*, where restaurants and bars were threatened with sanctions (including loss of license) by the Virginia ABC Board.[89]

This case is more akin to *Benham*, where the plaintiffs sought a public-assembly permit to hold an event to speak about *Roe v. Wade*.[90]  The city did not accept and process the permit application because the event was not expected to interfere with traffic; under the city's picketing ordinance, such an event could be held "by right" without a permit.[91]  The demonstration took place, and the plaintiffs later brought suit alleging that the public-assembly ordinance unconstitutionally favored certain types of speech.  On appeal, this Court found that the plaintiffs had not alleged any injury arising from the denial of the plaintiffs' permit application: "the Plaintiffs have never explained how the event they held was any different from the one that would have taken place had a permit been granted."[92]  The Court rejected the invitation to "compare two events—one purely imaginary—and, on that

---

[88] 708 F.3d 549, 552 (4th Cir. 2013).

[89] 524 F. Supp. 2d 728, 733-34 (E.D. Va. 2007).  *See also Bordell*, 922 F.2d at 1060 ("Had Bordell been prosecuted or otherwise punished for conduct that was proscribed . . . he would have suffered a cognizable injury that would be sufficient to confer standing . . . .").

[90] 635 F.3d at 131.

[91] *Id.*

[92] *Id.* at 137.

23

basis, divine an injury.  Such an inquiry would be an exercise fraught with supposition . . . ."[93]  Accordingly, it concluded that the plaintiffs' claims were too "conjectural and speculative" to support standing.  The same rationale and conclusion apply here.[94]

## II.   Rest Area information displays are government speech that is not subject to First Amendment scrutiny.

### A.   The case was properly dismissed because Appellants' allegation that their publications are "private speech on public property" is a legal conclusion, not a fact that must be accepted as true.

The district court applied the correct standard when it dismissed both of Appellants' complaints: "to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[95]  Although a court must accept all factual matter pled as true, the

---

[93] *Id.*

[94] *See also Kemler v. Poston*, 108 F. Supp. 2d 529, 539 (E.D. Va. 2000) (substitute judges did not have standing to contest judicial opinion that they must refrain from voting in primary elections where they merely concerned about "'risk of being in violation of the canons of ethics'" if they voted; "rather than establishing a concrete, imminent injury, [they] have 'merely alleged that [the opinion] deterred [them] by exercising a chilling effect on [their] First Amendment rights . . . .'").

[95] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

court is not "bound to accept as true a legal conclusion couched as a factual allegation."[96]

Appellants argue that the district court "ignored" their "assertion" that the speech in this case is "not 'government speech' . . . but instead is private speech that occurs on public property . . . ."[97]  But whether speech is "government speech" or "private speech" is a *legal* determination and not a fact that can be alleged. Appellants' conclusory allegation that Rest Area information displays are "private speech" does not make it so, and the district court was not bound to accept that statement as true.  Nor was the district court required to accept as "fact" Appellants' allegation that Rest Areas are public forums.[98]

To make out a legal claim Appellants needed to allege facts that, if true, showed that the information displays are "private speech" and that Rest Areas are public forums.  They did not do so.

**B.    The Rest Area information displays are government speech.**

The district court correctly applied controlling Supreme Court precedent in determining that the Rest Area information displays managed by VDOT and VTC

---

[96] *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555 (2007)).

[97] Br. of Appellants at 31.

[98] *See generally id.* at 34-35.

are government speech. In both *Summum* and *Walker* the Supreme Court applied a three-factor test to make that determination:

(1)    Has the State used the speech to convey governmental messages?

(2)    Is the speech "closely identified in the public mind" with the State?

(3)    Does the State exercise editorial control over the speech's content?[99]

Applying those factors here demonstrates that the Rest Area information displays are government speech, not private speech. Virginia therefore has the right to choose what it says—even with the assistance of private partners—and no further First Amendment analysis is warranted.

### 1.    The Rest Area information displays convey a government message.

Virginia has a long history of communicating a message to the public through Rest Area information displays—the promotion of tourism and safe travel. As Appellants acknowledged in their complaint, Rest Areas have "[h]istorically . . . existed" for "dissemination of information" and "promotion of tourism."[100] Rest Areas have always been a source of information for travelers, including maps of Virginia, places to visit while in Virginia, and tourist pamphlets and destination brochures. Rest Areas thereby accomplish their central purpose—

---

[99] *Summum*, 555 U.S. at 470-72; *Walker*, 135 S. Ct. at 2248-49.

[100] First Am. Compl. ¶ 11 (JA 172).

"to promote the safety and well-being of the traveling public by providing," among other things, "travel-related information."[101]

Thus, as with the monuments and license plates found to be government speech in *Summum* and *Walker*, respectively, Virginia has a long history of "using [the Rest Area information displays] to speak to the public."[102]  Speaking through the information displays, Virginia promotes its message of tourism and the variety of activities and attractions that are available across the Commonwealth.  The first part of the Supreme Court's three-factor test is satisfied.

> **2.    The Rest Area information displays are closely identified with the government.**

The second factor is also met because the Rest Area information displays are "closely identified in the public mind with the" Commonwealth of Virginia.[103]  Rest Areas are government-run facilities, connected to government-maintained highways.  What the Supreme Court said about public parks in *Summum* is equally true for the Rest Areas here: the public will naturally identify them "with the government unit that owns the land."[104]  Indeed, the Code of Virginia enforces that

---

[101] *VDOT Implementation of Rest Area Revenue Generating Programs*, First Am. Compl. Ex. E at 1 (JA 197).

[102] *Summum*, 555 U.S. at 470.

[103] *See Walker*, 135 S. Ct. at 2248 (quoting *Summum*, 555 U.S. at 472).

[104] 555 U.S. at 472.

close identification by authorizing VDOT to make maps, informational directories, and advertising materials available to the public and to "provid[e] such other information as may be considered desirable."[105]

Rest Areas are not just for travelers to rest, get refreshments, and use the restrooms—they are literally "welcome centers" for the Commonwealth, where travelers know they can find maps, travel information, and other tourism-related materials. Many visitors to Virginia will form their first—and possibly last—impression of the Commonwealth based on the Rest Areas and the information available there. Travelers understandably associate materials placed in Rest Area information displays with the government of Virginia, whether the information materials take the form of road maps, updates on road conditions, brochures for local attractions, or other tourism publicity. And travelers would likely assume—correctly—that the informational materials placed in a government-run facility have actually been approved by the government.

---

[105] Va. Code Ann. § 33.2-1217(D) (2014). *See also* Va. Code Ann. § 33.2-1200 (defining an "information center" as "an area or site established and maintained at rest areas for the purpose of informing the public of places of interest within the Commonwealth and providing such other information as the Commonwealth may consider desirable").

### 3.     Virginia exercises editorial control over the content of the Rest Area information displays.

The last element of the Supreme Court's government-speech test is satisfied by the control that the Commonwealth exercises over the contents of the information displays.

The government's authority to supervise the content of information displays is expressly granted in the Code of Virginia, which provides that Rest Area information centers exist to "inform[] the public of places of interest within the Commonwealth and provid[e] such other information *as the Commonwealth may consider desirable*."[106]  And the Commonwealth's practice of exercising that editorial control is not in dispute—indeed, the gravamen of Appellants' claims is that the government has exercised that control *too* actively.[107]

The content restrictions that Appellants challenge clearly reflect VDOT's determination to control the message that is communicated to the traveling public. VDOT's policy document governing the SAVE program provides detailed standards on what content is acceptable for written materials to be displayed at

---

[106] Va. Code Ann. § 33.2-1200 (emphasis added).  *See also* Va. Code Ann. § 33.2-1217(D) (authorizing VDOT to "maintain maps, permit informational directories and advertising pamphlets to be made available at rest areas, . . . and provid[e] such other information as may be considered desirable").

[107] *See also* First Am. Compl. ¶ 23 (JA 184-85) (stating the "plantiffs do not know what evaluation criteria VTC is using and believe[] that VTC is unduly restricting and threatening free speech").

Rest Areas.[108]  The contract between VTC and HIM implementing PMAP contains

more than a dozen of the same specific restrictions on content for any displayed

materials.[109]  And the "PMAP Policies" document likewise communicates those

restrictions and guidelines for vendors participating in PMAP.[110]

Any one of these documents would suffice to demonstrate editorial control

over the content of the written materials at the Rest Areas.[111]  Together, they

conclusively show the State government's consistent editorial control over the

content of Rest Area information displays.[112]  Thus, what the Supreme Court said

in *Summum* is equally true in this case:

> Government decisionmakers select the [informational
> materials] that portray what they view as appropriate for the
> place in question, taking into account such content-based
> factors as esthetics, history, and local culture.  The [materials]
> that are accepted, therefore, are meant to convey and have the

---

[108] *VDOT Implementation of Rest Area Revenue Generating Programs*, First Am.
Compl. Ex. E (JA 197).

[109] First Am. Compl. Exs. E and G (JA 197-200, 203-30).

[110] *See* PMAP Policies, First Am. Compl. Ex. H at 9 (JA 239).

[111] To the extent that 24 Virginia Administrative Code § 30-50-10(L) is relevant—
it is a generally applicable restriction on behavior at Rest Areas—it too
demonstrates editorial control because it prohibits "threatening, abusive,
boisterous, insulting or indecent language."

[112] *See also Page v. Lexington Cty. Sch. Dist. One*, 531 F.3d 275, 285 (4th Cir.
2008) (school district "established its own message and effectively controlled the
channels of communication through which it disseminated that message, as
required for application of the government speech doctrine").

effect of conveying a government message, and they thus
constitute government speech.[113]

The same reasoning applies here, and so should the conclusion that the

tourism materials in Rest Area information displays are government speech.

### C.    Appellants' attempts to distinguish *Summum* and *Walker* are unavailing.

Appellants raise three arguments why the government-speech principles set

forth in *Summum* and *Walker* do not apply here.  Each fails.

### 1.    It is irrelevant that the Rest Area information displays include materials not produced by the government.

Appellants mistakenly conclude that this case is distinguishable from

controlling Supreme Court precedent because here it is Appellants, not the

government, who are the "writers, editors, producers and distributors" of the

materials placed in the display racks.[114]  But third parties likewise supplied the

monuments in *Summum*, a fact that the Court found irrelevant: "[j]ust as

government-commissioned and government-financed monuments speak for the

government, so do privately financed and donated monuments that the government

accepts and displays to the public on government land."[115]  The city government

was simply the recipient of monuments that a third party had designed, produced,

---

[113] *Summum*, 555 U.S. at 472.

[114] Br. of Appellants at 32.

[115] *Summum*, 555 U.S. at 470-71.

and placed in the park. Nonetheless, the government exercised editorial control by retaining "final approval authority" over the monuments that were installed.[116] Thus, it does not matter that VDOT itself did not produce or pay for the materials in the Rest Area information displays.[117]

*Walker* likewise rejected the distinction Appellants attempt to draw. There the Court acknowledged that Texas did not design specialty license plates itself, but instead considered and accepted designs submitted by organizations promoting the plates.[118] The Court expressly held that Texas's practice was not inconsistent with the Court's finding that the license plates are government speech: "[t]he fact that private parties take part in the design and propagation of a message *does not extinguish the governmental nature of the message* or transform the government's role into that of a mere forum-provider."[119]

In both *Walker* and *Summum*, the Court specifically found that the government is free to "exercise its freedom to express its views even when it receives assistance from private sources for the purpose of delivering a

---

[116] *Id*. at 464-65.

[117] "[H]ence no 'government speech' in the literal sense. [But] there was none in *Summum* either, and it is the leading case on 'government speech.'" *Ill. Dunesland Pres. Soc. v. Ill. Dep't of Nat. Res.*, 584 F.3d 719 (7th Cir. 2009).

[118] *Walker*, 135 S. Ct. at 2244-45.

[119] *Id*. at 2251 (emphasis added).

32

government-controlled message."[120]  The fact that the tourism publications distributed at Rest Area information displays originate with private entities, before being accepted by Virginia for display, is irrelevant: the publications convey a government message and therefore are government speech.[121]

### 2.    It is irrelevant that the materials in Rest Area information displays are not permanent fixtures.

Appellants also assert that *Summum* is distinguishable because a "key factor in th[at] opinion was that monuments placed in public spaces . . . are generally permanent additions."[122]  But the significance they assign to the relatively "permanent" nature of the monuments in *Summum* is not warranted.

The Supreme Court has never required that communications be permanent to be government speech.  It brushed aside that suggestion in *Walker*, stating that "not . . . every element of our discussion in *Summum* is relevant," acknowledging that the license plates were not "permanent" like the monuments in *Summum*.[123]  Nonetheless, the Court concluded that the plates were government speech:

> [I]n *Summum* . . . [w]e believed that the speech at issue was
> government speech rather than private speech in part because
> we found it "hard to imagine how a public park could be

---

[120] *Id.* (internal punctuation omitted) (quoting *Summum*, 555 U.S. at 468.

[121] *Walker*, 135 S. Ct. at 2250.

[122] Br. of Appellants at 32-33.

[123] *Walker*, 135 S. Ct. at 2249 (internal citation omitted).

33

> opened up for the installation of permanent monuments by every person or group wishing to engage in that form of expression."  Here, a State could theoretically offer a much larger number of license plate designs, and *those designs need not be available for time immemorial.*[124]

The Court then expressly clarified that its consideration of the monuments' "permanent" nature in *Summum* was relevant only because the case involved a public forum:

> [T]hose characteristics of the speech at issue in *Summum* were particularly important because the government speech at issue occurred in public parks, which are traditional public forums for "the delivery of speeches and the holding of marches and demonstrations" by private citizens.[125]

"By contrast," the Court emphasized, "license plates are *not* traditional public forums for private speech."[126]  As more fully set forth in Part III, Rest Area information displays likewise are not traditional (or designated) public forums, and so the relative "permanence" of the communications is irrelevant.

---

[124] *Id.* (quoting *Summum*, 555 U.S. at 479) (internal citation omitted) (emphasis added).

[125] *Id.* (quoting *Summum*, 555 U.S. at 478).

[126] *Id.* at 2249-50 (emphasis added).

3.    **Imposing fees to include materials in Rest Area information displays does not convert government speech into private speech.**

Appellants are wrong to characterize the fees charged under the SAVE and PMAP programs as an "unconstitutional tax on their free speech."[127]  When the government speaks, even when it's through materials developed by third parties, the government may generate revenue—and profit—from its speech.[128]

In *Walker*, the Supreme Court found that imposing fees did not vitiate the government-speech doctrine:

> [T]he fact that Texas vehicle owners pay annual fees in order to display specialty license plates does not imply that the plate designs are merely a forum for private speech.  While some nonpublic forums provide governments the opportunity to profit from speech, *the existence of government profit alone is insufficient to trigger forum analysis* . . . .  [W]e think it sufficiently clear that Texas is speaking through its specialty license plate designs, such that the existence of annual fees does not convince us that the specialty plates are a nonpublic forum.[129]

The Court underscored that conclusion by clarifying that, in *Summum*, even if Pleasant Grove City had imposed fees on nonprofit organizations for placing

---

[127] *See, e.g.*, Br. of Appellants at 30.

[128] *See Walker*, 135 S. Ct. at 2252.

[129] *Id.* (emphasis added).

monuments in its park, it would not have changed the Court's conclusion that the monuments are government speech.[130]

### D.    Because the Rest Area information displays are government speech, the government's content restrictions are not subject to First Amendment scrutiny.

The Supreme Court has recognized that the "government can speak for itself" and "is entitled to promote a program, to espouse a policy, or to take a position."[131]  "[W]hen the government speaks, it is not barred by the Free Speech clause from determining the content of what it says."[132]

As the district court correctly concluded, that principle is fatal to Appellants' challenge to the content restrictions.[133]  Once a court determines that government speech is involved, no further scrutiny or forum analysis is necessary.  For instance, in *Walker*, the Supreme Court specifically rejected the idea that Texas had created a "forum for private speech by making license plates available to display the private parties' designs" and instead concluded that Texas was "speaking on its own behalf."[134]  As a result, forum analysis was "misplaced"; "the

---

[130] *Id.*

[131] *Id.* at 2246.

[132] *Id.* at 2245.

[133] Opinion and Order at 18, 28 (JA 261, 271).

[134] *Walker*, 135 S. Ct. at 2250.

36

First Amendment strictures that attend the various types of government-established forums d[id] not apply."[135]

Although that conclusion may "seem strange,"[136] it is the only sensible outcome. "Were the Free Speech Clause interpreted otherwise, government would not work."[137] First, a government would lose the ability to promote its message:

> How could a city government create a successful recycling program if officials, when writing householders asking them to recycle cans and bottles, had to include in the letter a long plea from the local trash disposal enterprise demanding the contrary? How could a state government effectively develop programs designed to encourage and provide vaccinations, if officials also had to voice the perspective of those who oppose this type of immunization?[138]

"[I]t is not easy to imagine how government could function if it lacked th[e] freedom" to select the messages it wishes to convey.[139] Here, for instance, if Virginia lost the ability to control content, it would not be able to prohibit

---

[135] *Id.*

[136] Opinion and Order at 18 (JA 261).

[137] *Walker*, 135 S. Ct. at 2250.

[138] *Id.* at 2246.

[139] *Id.* (quoting *Summum*, 555 U.S. at 468). *See also Ill. Dunesland Pres. Soc.*, 584 F.3d at 725 (rejecting idea that "every public display rack [must] exhibit on demand pamphlets advocating nudism, warning that the world will end in 2012 . . . , reciting the 'Seven Aphorisms of Summum' (the title of the plaintiff's monument in the *Summum* case), or proclaiming the unconstitutionality of the income tax, together with pamphlets expressing the opposing view on all these subjects").

advertisements in Rest Areas for attractions located *outside* Virginia.[140]  It "would be forced to allow advertisements that disparaged Virginia's many wonderful attractions" or "that suggested that Maryland and North Carolina were more worthy travel destinations"—and that "would undermine the entire purpose of the . . . displays."[141]

Second, as the Supreme Court explained in *Summum*, "where the application of forum analysis would lead almost inexorably to closing of the forum, it is obvious that forum analysis is out of place."[142]  Applying that analysis, the Court explained that if governments were forced to maintain neutrality in placing monuments in a public park, they would need to "either 'brace themselves for an influx of clutter' or face the pressure to remove longstanding and cherished monuments."[143]  Similarly, forcing VDOT to allow materials of every kind to be placed in the Rest Areas would inevitably cause the overcrowding—and likely the shutdown—of Virginia's information-display program.[144]

---

[140] *See* PMAP Policies, First Am. Compl. Ex. H at 9 (JA 239).  *See also* VTC-HIM Contract, First Am. Compl. Ex. G at 7 (JA 209).

[141] Opinion and Order at 27 (JA 270).

[142] *Summum*, 555 U.S. at 480.

[143] *Id*. at 479-80 (quoting *Summum v. Pleasant Grove City*, 499 F.3d 1170, 1175 (10th Cir. 2007) (McConnell, J., dissenting from denial of rehearing en banc)).

[144] The comparison does not fail because *Summum* involved fewer monuments than pieces of tourism literature in the Rest Area information displays; the Court's

In fact, the United States Court of Appeals for the Seventh Circuit, confronted with facts similar to those here, applied *Summum*'s reasoning in finding forum analysis inapplicable. In *Illinois Dunesland Preservation Society v. Illinois Department of Natural Resources*,[145] the Department selected pamphlets and brochures for placement in various buildings throughout a state park.[146] When a nonprofit organization requested placement of a brochure detailing the dangers of asbestos at the park, the Department denied its request.[147] Without expressly determining that the brochure constituted government speech, the Seventh Circuit concluded, in an opinion by Judge Posner, that a forum analysis was unnecessary because subjecting the State park's placement of pamphlets and brochures to First Amendment scrutiny would lead to absurd results. For every pamphlet showing off the wonders of the park, the State would be forced to accept a pamphlet pointing out the alleged dangers, and the "display rack would soon be crowded with angry pamphlets by environmental activists, and rejoinders by park and other

---

"holding in *Summum* was not dependent on the precise number of monuments found within the park." *Walker*, 135 S. Ct. at 2251. *See also id.* (noting that "Texas allows many more license plate designs than the city in *Summum* allowed monuments").

[145] 584 F.3d 719 (7th Cir. 2009).

[146] *Id*. at 721-22.

[147] *Id*.

state officials."[148]  That would negate the purpose of the racks.  Judge Posner also

recognized "the compelling practical objections to the plaintiff's position"[149]—that

it would overburden and lead to the shutdown of tourism displays such as

"turnpike service plazas":

> Display racks crammed with brochures and pamphlets are
> omnipresent in public property in the United States, not only
> parks and other areas of public recreation but also turnpike
> service plazas and the lobbies of government buildings.  If the
> plaintiff's conception of freedom of speech prevailed, every
> clerk responsible for stocking such a display rack would face a
> potential First Amendment suit by an interest group that wanted
> to influence government action or public opinion.[150]

Thus, because the government had the right to accept or reject any pamphlet it

chose, the Seventh Circuit ruled that the government did not violate the

organization's First Amendment rights.[151]  The same analysis applies here.

For all those reasons, the district court was correct to conclude that the Rest

Area information displays are government speech, and thus the content restrictions

do not violate Appellants' First Amendment rights.

---

[148] *Id.* at 725.

[149] *Id.*

[150] *Id.*

[151] *Id.*

III. **Even if forum analysis were necessary, Rest Areas are nonpublic forums in which speech is subject to reasonable restrictions.**

A. **The Rest Areas are nonpublic forums.**

Even if the Rest Area information displays were treated as private speech and not government speech, the Commonwealth would still be free to place reasonable restrictions on the content of the displays because Rest Areas are nonpublic forums and are therefore "governed by different [First Amendment] standards."[152]

Appellants mistakenly suggest that the Rest Areas are public forums—in the same category as parks, streets, and sidewalks—because they are public property.[153] But the term "public property" is not interchangeable with "public forum." The First Amendment "does not guarantee 'access to property simply because it is owned or controlled by the government.'"[154] The Supreme Court has defined "public forums" as areas that "by long tradition or by government fiat have been devoted to assembly and debate . . . ."[155] It has defined a nonpublic forum, by

---

[152] *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983).

[153] *See generally* Br. of Appellants at 34-35. *See also id.* at 34 (comparing the Rest Areas to the Virginia Beach boardwalk and "public parks" and insisting that "First Amendment rights do apply to public spaces").

[154] *Sons of Confederate Veterans, Va. Div. v. City of Lexington*, 722 F.3d 224, 231 (4th Cir. 2013) (quoting *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 129 (1981)).

[155] *Perry*, 460 U.S. at 45.

contrast, as a "[p]ublic property which is not by tradition or designation a forum for public communication . . . ."[156] That definition alone refutes Appellants' flawed assumption that every "public property" is necessarily a "public forum."[157]

Rest Areas are plainly nonpublic forums.[158] First, there is no "long tradition," in Virginia or elsewhere, of rest areas as forums for public speech or debate. At least four other federal circuits have treated rest areas as nonpublic forums.[159] As the Seventh Circuit explained, in language borrowed from the

---

[156] *Id.* at 46.

[157] *See* Br. of Appellants at 34-35. It also distinguishes every case Appellants cite, all of which involve public forums: *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 551 (4th Cir. 2013) (pedestrian mall and city streets); *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 152 (1969) (public streets and sidewalks); *Reynolds v. Middleton*, 779 F.3d 222, 225 (4th Cir. 2015) (public highways and medians); *Robert v. City of Norfolk*, 188 Va. 413, 416 (1948) (public streets).

[158] *Cf. ACLU v. Mineta*, 319 F. Supp. 2d 69, 81-83 (D.D.C. 2004) (buses, subway cars and subway stations); *James v. Washington Metro. Area Transit Auth.*, 649 F. Supp. 2d 424, 429 (D. Md. 2009) (subway stations); *Sanders v. City of Seattle*, 156 P.3d 874, 884-85 (Wash. 2007) (easement through shopping mall to city's monorail platform).

[159] *See Jacobsen v. Illinois DOT*, 419 F.3d 642, 647 (7th Cir. 2005) (assuming without deciding that interstate rest areas are nonpublic forums); *Jacobsen v. Howard*, 109 F.3d 1268, 1272 (8th Cir. 1997) (assuming without deciding, and as all parties conceded, that interstate rest areas are nonpublic forums); *Jacobsen v. Bonine*, 123 F.3d 1272, 1274 (9th Cir. 1997) (holding that rest areas and perimeter walkways are nonpublic forums); *Sentinel Communications Co. v. Watts*, 936 F.2d 1189, 1203-04 (11th Cir. 1991) ("it seems clear to us that rest areas are non-traditional fora").

42

Eleventh Circuit, the purpose of rest areas is not to facilitate speech but "safe and efficient travel":

> [A]s components of the Interstate System, safety rest areas are hardly the kind of public property that has by long tradition or by governmental fiat . . . been devoted to assembly and debate . . . . As modern phenomena, rest areas have never existed independently of the Interstate System; they are optional appendages that are intended, as part of the System, to facilitate safe and efficient travel by motorists along the System's highways.[160]

Thus, "safety rest areas . . . have not 'immemorially been held in trust for the use of the public,' and have not, 'time out of mind,' 'been used for purposes of assembly.'"[161]

Second, Virginia has not designated Rest Areas as public forums by opening them up for public speech, debate, assembly, or solicitation.[162]  VDOT's limited use of Rest Areas shows that Virginia has consistently intended them "for the

---

[160] *Jacobsen v. Ill. DOT*, 419 F.3d at 647 (quoting *Sentinel Commc'ns Co.*, 936 F.2d at 1203).  *See also* 23 C.F.R. § 752.3(a) (defining "safety rest area" as a "roadside facility safely removed from the traveled way with parking and such facilities for the motorist deemed necessary for his rest, relaxation, comfort and information needs").

[161] *Sentinel Commc'ns Co.*, 936 F.2d at 1203 (quoting *Hague v. CIO*, 307 U.S. 496, 515 (1939)).

[162] *Cf. Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 805 (1985) ("The Government did not create the CFC for purposes of providing a forum for expressive activity . . . .  An examination of the nature of the Government property involved strengthens the conclusion that the CFC is a nonpublic forum."); *Greer v. Spock*, 424 U.S. 828, 838 (1976) ("[The] business of a military installation [is] . . . to train soldiers, not to provide a public forum").

43

convenience of the traveling public" and to provide motorists with government-supplied comfort, information, and rest.[163]  And when VDOT launched the SAVE program, its implementation directive expressly stated its intention, in determining what advertisements will be appropriate, that "[Safety Rest Areas] and all spaces within will be maintained as non-public forums in which reasonable, uniform, viewpoint-neutral standards will be applied . . . ."[164]

Virginia's government has not acted to broaden the mission or use of the Rest Areas.  Far from it.  In 2013, the Attorney General of Virginia opined that an interstate rest area is a "nonpublic forum."[165]  If that conclusion contradicted the General Assembly's understanding or intent, it could have designated the Rest Areas as public forums.  But it has not done that; its "failure to make corrective amendments evinces legislative acquiescence in the Attorney General's view."[166]  Appellants attack the Attorney General's opinion as "outdated" and suggest that it "ignores the reality of how rest stops and welcome centers have evolved and now

---

[163] *See* Va. Code Ann. § 33.2-1200 (defining "rest area" as "an area or site established and maintained . . . for the convenience of the traveling public").  *See also VDOT Implementation of Rest Area Revenue Generating Programs*, First Am. Compl. Ex. E at 1 (JA 197) (purposes of rest area are "to promote the safety and well-being of the traveling public").

[164] *VDOT Implementation of Rest Area Revenue Generating Programs*, First Am. Compl. Ex. E at 3 (JA 199).

[165] 2013 Op. Va. Att'y Gen. 55, 58, 59.

[166] *Beck v. Shelton*, 267 Va. 482, 492, 593 S.E.2d 195, 200 (2004).

44

operate . . . in modern times."[167]  But they fail to identify any statutory changes in

the intervening three years that warrant a different conclusion.

For those reasons, it is evident that the Rest Areas and the information

displays are nonpublic forums.[168]

**B.    Because Rest Areas are nonpublic forums, Virginia is entitled to impose reasonable restrictions and fees on the information displays.**

**1.    The content restrictions that Appellants challenge are viewpoint-neutral and therefore permissible.**

Nonpublic forums like the Rest Areas are "governed by different [First

Amendment] standards" than public forums.[169]  A government may impose

restrictions on speech in nonpublic forums that are reasonable and viewpoint-

neutral.[170]  Governments may permissibly apply a variety of restrictions on speech,

including restricting access, banning solicitation, and charging fees; those

restrictions need not be the most reasonable or the only reasonable method of

governing speech.[171]

---

[167] Br. of Appellants at 36 n.10.

[168] "For similar reasons, interstate rest areas are also not 'designated' public fora which the government 'intentionally' opened for public discourse." *Jacobsen*, 123 F.3d at 1274 (citing *Cornelius*, 473 U.S. at 788).

[169] *Perry*, 460 U.S. at 46.

[170] *See Cornelius*, 473 U.S. at 802; *Perry*, 460 U.S. at 37, 45.

[171] *See Cornelius*, 473 U.S. at 808.

Appellants claim that the content restrictions for Rest Area information displays are unconstitutional because they do not permit them to include advertisements in their guides that:

> (1) solicit donations, (2) advertise commercial and residential real estate, (3) provide ratings and opinions relating to various businesses and services, (4) advertise properties with membership requirements, (5) advertise liquor and tobacco products, and (6) constitute political and religious advertisements and messages.[172]

But none of those challenged restrictions is a viewpoint-specific restriction. They restrict areas of content, but they do not favor any viewpoint over another and therefore do not violate the First Amendment.

That reasoning has led the Supreme Court to uphold government restrictions on, for instance, soliciting and political ads in nonpublic forums.[173] In *Lehman v. City of Shaker Heights*, for instance, the Supreme Court rejected a challenge to a public transportation system's prohibition on political advertisements.[174] In upholding the prohibition, the Court pointed out the absurd situation that would result from a contrary ruling:

---

[172] First Am. Compl. ¶ 23 (JA 185).

[173] *See, e.g.*, *United States v. Kokinda*, 497 U.S. 720, 733 (1990) (upholding a ban on solicitation on post office property); *Lehman v. City of Shaker Heights*, 418 U.S. 298, 304 (1974) (plurality opinion).

[174] 418 U.S. at 304.

> Were we to hold to the contrary, display cases in public hospitals, libraries, office buildings, military compounds, and other public facilities immediately would become Hyde Parks open to every would-be pamphleteer and politician.  This the Constitution does not require.[175]

Those same considerations justify the restrictions Virginia has imposed on the Rest Area information displays.  Take, for example, the prohibition on "[p]ublications . . . that are not targeted to the traveling public or tourism related."[176] If Virginia could not impose that reasonable restriction, it could not carry out its mission to "provide information in the specific interest of the traveling public."[177] Instead, Virginia has chosen to keep the Rest Area information displays focused on tourism and travel-related information through reasonable restrictions.  So while advertisements for liquor are not permitted, "[a]dvertising for tours of wineries, breweries, distilleries and meaderies is acceptable."[178]  The content restrictions are reasonable, viewpoint-neutral, and constitutionally permitted.

---

[175] *Id.*

[176] PMAP Policies, First Am. Compl. Ex. H at 9 (JA 239).

[177] Va. Code Ann. § 33.2-1217(D).

[178] PMAP Policies, First Am. Compl. Ex. H at 9 (JA 239).

## 2.    The imposition of fees does not violate the First Amendment.

Appellants repeatedly characterize the fees charged under the SAVE and PMAP programs as an "unconstitutional tax on their free speech,"[179] but there is no substance to match their rhetoric.  The First Amendment permits fees to be charged for materials in the Rest Area information displays, just as Texas permissibly charged for specialty licenses plate in *Walker*, and as Pleasant Grove City could have permissibly charged maintenance fees for placing monuments in a park in S*ummum*.[180]  Indeed, when the Attorney General of Virginia was asked for an official opinion about this precise situation in 2013—whether Virginia could permissibly charge fees for including materials in Rest Area information displays— he concluded that it could.[181]

---

[179] *See, e.g.*, Br. of Appellants at 30.

[180] *See Walker*, 135 S. Ct. at 2252.  *See also, e.g.*, *Gannett Satellite Info. Network, Inc. v. Metro. Transp. Auth.*, 745 F.2d 767, 775, 772 (2d Cir. 1984) (finding that licensing fees are valid and not a First Amendment violation because they "serve the significant governmental interest of raising revenue" for the railroad system); *Atlanta Journal & Constitution v. City of Atlanta Dep't of Aviation*, 322 F.3d 1298, 1309, 1312 (11th Cir. 2003) (finding that governments may engage in and negotiate a profit-conscious contract for distribution space in a nonpublic forum for First Amendment activities).

[181] 2013 Op. Va. Att'y Gen. at 58 ("[T]he First Amendment protection of free speech does not prohibit VDOT, when it is acting reasonably and in a proprietary capacity, from negotiating commercially reasonable, profit-conscious contracts for advertising and distributing written materials at its Rest Areas.").

Appellants have not cited any cases to the contrary. Although they string-cite nine cases for the proposition that governments may not burden speech "through the imposition of unreasonable or arbitrary fees and permit requirements,"[182] those cases mostly concern permit requirements, not fees. For example, in *Reed v. Town of Gilbert*,[183] a church and its pastor wanting to advertise the time and location of their church services challenged an ordinance restricting the display of outdoor signs. The Supreme Court concluded that the ordinance was an impermissible content-based regulation of speech. Fees were not discussed by the Court. In *Cincinnati v. Discovery Network, Inc.*,[184] the Supreme Court found that the City's regulation of news racks was not "content neutral" because the prohibition depended on the content of the publications. Again, fees were not an issue.

The few cases that Appellants cite that involve fees either are inapposite or do not go as far as Appellants claim. For instance, in *Forsyth County v. Nationalist Movement*,[185] the Supreme Court struck down content-based requirements for a county's permitting process for parades, assemblies, and demonstrations. But there,

---

[182] *See* Br. of Appellants at 38.

[183] 135 S. Ct. 2218 (2015).

[184] 507 U.S. 410 (1993).

[185] 505 U.S. 123 (1992).

49

the fees being charged for the permits were *based on the content of the speech.*[186]

That is not the situation here—the fees charged to publishers of tourism materials are

not related to the content of the materials (and Vista-Graphics has not alleged that

they are).  Similarly, *Child Evangelism Fellowship v. Anderson School District*[187]

concerned fees that were charged to private groups for use of school property.  The

Court noted that the "Constitution does not prevent the district from opening its

buildings for community use *or from recouping the costs of this service.*"[188]  Thus,

although the Court found that the manner of charging the fees was unconstitutionally

based on the content of speech, the Court accepted that fees could be imposed.

Appellants' other cases are not on point either.[189]

---

[186] *Id.* at 134.

[187] 470 F.3d 1062 (4th Cir. 2006).

[188] *Id.* at 1074 (emphasis added).

[189] *See City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 772 (1988)
(finding unconstitutional a city ordinance that gave a mayor unfettered discretion
to deny an application for a newsrack "rental permit" and to condition the permit
on any additional terms he deemed "necessary and reasonable"); *Shuttlesworth v.
City of Birmingham*, 394 U.S. 147, 150 (1969) (city ordinance unconstitutional that
gave city commission "virtually unbridled and absolute power to prohibit" a
parade, procession or demonstration on city streets); *Cox v. City of Charleston*, 416
F.3d 281, 284 (4th Cir. 2005) (local parade ordinance unconstitutional to the extent
it required obtaining a permit before protesting in a public forum and prohibited
granting permits for speech activities between 8 a.m. and 1 p.m. on Sundays);
*Elam v. Bolling*, 53 F. Supp. 2d 854, 855 (W.D. Va. 1999) (town ordinance
unconstitutional that prohibited dancing in a public place); *Robert v. City of
Norfolk*, 188 Va. 413, 415 (1948) (ordinance unconstitutional that denied citizens
the ability to sell magazines on city streets).

C.     **The Virginia Administrative Code does not confer any additional speech rights on Appellants.**

Appellants also attempt to draw support from a subsection of the Virginia Administrative Code that provides that "[v]endors of newspapers and written materials enjoy constitutional protection under the First Amendment to place or operate their services within rights-of-way, provided that they neither impede traffic nor impact the safety of the traveling public."[190]  Their reliance is misplaced for two reasons.

First, Appellants overlook that the chapter and section containing this language applies to *land-use permits* on *rights-of-way*.[191]  This case does not involve a request for a land-use permit.  And even if it did, the Virginia Code recognizes that a rest area may or may not be within a right-of-way.[192]

---

[190] 24 Va. Admin. Code § 30-151-670(2)(b).

[191] *See* 24 Va. Admin. Code § 30-151-670 (Chapter 151: "Land Use Permit Regulations"; Section 670: "Prohibited Use of Right-of-Way").

[192] Va. Code Ann. § 33.2-1200 (defining a "rest area" as "an area or site established and maintained within *or adjacent to* the right-of-way or *under public supervision or control* for the convenience of the traveling public") (emphasis added).  *See also* 24 Va. Admin. Code § 30-151-10 (defining "right-of-way" as "that property within the system of state highways that is open or may be opened for public travel or use or both in the Commonwealth. This definition includes those public rights-of-way in which the Commonwealth has a prescriptive easement for maintenance and public travel. The property includes the travel way and associated boundary lines, parking and recreation areas and other permanent easements for a specific purpose.").

51

Second, the subsection merely repeats the truism that citizens have protected First Amendment rights. It does not confer any *greater* rights on vendors doing business in right-of-ways. The section in which it is found sets forth a general rule that vendors are not permitted to operate business within rights-of-way, subject to certain exceptions; the subsection Appellants cite merely clarifies that it is not abrogating citizens' First Amendment protections. As demonstrated above, Appellants' First Amendment rights have not been violated.

## CONCLUSION

Appellants have not adequately alleged facts showing that they have standing to challenge the content restrictions that Virginia has placed on materials placed in the Rest Area information displays. And Appellants' challenge to the fees imposed for including materials in the information displays also fails because the displays are government speech that is not subject to First Amendment scrutiny.

The district court's ruling should be affirmed.


Respectfully submitted,


VIRGINIA DEPARTMENT OF
TRANSPORTATION,
VIRGINIA TOURISM CORPORATION,
AUBREY L. LAYNE, JR., in his official
capacity as Secretary of Transportation, and

52

CHARLES A. KILPATRICK, P.E., in his official capacity as Commissioner of the Virginia Department of Transportation,

By: ___/s/_____
TREVOR S. COX (VSB #78396)
Deputy Solicitor General of Virginia
900 East Main Street
Richmond, Virginia 23219
(804) 786-7704 – Telephone
(804) 371-0200 – Facsimile
tcox@oag.state.va.us

*Counsel for Appellees*

MARK R. HERRING
*Attorney General of Virginia*

STUART A. RAPHAEL (VSB #30380)
*Solicitor General*

JEFFREY M. BOURNE
*Deputy Attorney General*

JEFFREY R. ALLEN (VSB #17710)
JANET W. BAUGH (VSB #44649)
ERIC K.G. FISKE (VSB #15814)
*Senior Assistant Attorneys General*

ELIZABETH B. MYERS (VSB #80739)
GRANT E. KRONENBERG (VSB #65647)
*Assistant Attorneys General*

July 5, 2016

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is not necessary under Rule 34(a)(2). The facts and legal arguments are adequately presented in the briefs and record, and the Court may affirm on the basis of the district court's thorough opinion.

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman, a proportionally spaced font, and that it complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), because it contains 11,702 words, excluding the parts exempted by Rule 32(a)(7)(B)(iii), according to the count of Microsoft Word.

/s/
_____
Trevor S. Cox


## CERTIFICATE OF SERVICE

I hereby certify that on July 5, 2016, I electronically filed the foregoing brief with the Clerk of this Court by using the appellate CM/ECF system, which will effectuate service on all registered CM/ECF users.


/s/
_____
Trevor S. Cox

54